UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| ALVA RALPH HIXSON, III, | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 4:09-cv-3949 |
| | § | |
| HOUSTON INDEPENDENT SCHOOL | § | |
| DISTRICT, ET AL., | § | |
| | § | |
| **Defendants.** | § | |

## MEMORANDUM AND ORDER

Pending before the Court are Defendant's Motion to Strike Plaintiff's Statistical Expert (Doc. No. 59) and Defendant's Motion for Complete Summary Judgment (Doc. No. 61). Upon considering the motions, all responses thereto, and the applicable law, the Court finds that Defendant's Motion to Strike Plaintiff's Statistical Expert must be granted and Defendant's Motion for Complete Summary Judgment must be granted.

## I.     BACKGROUND

Plaintiff Alva Ralph Hixson, III ("Plaintiff" or "Hixson") has filed suit against Defendant Houston Independent School District ("Defendant" or "HISD") for HISD's alleged failure to hire him in violation of the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 629 *et seq*. The following undisputed facts are drawn from the record.

Hixson was born on August 19, 1952. (Hixson Dep. 16:10.) After many years of work in unrelated fields, Hixson decided to change careers and begin work in the education industry. (*Id.* 34:22-25.) He moved to McAllen in 2003. (*Id.* 18:2-23.) While living in McAllen, Hixson was accepted into the A-STEP alternative certification program, which provides individuals with a path to becoming a certified teacher. (*Id.* 38:21-39:15.) Hixson worked as a substitute teacher in

various area school districts, including PSJA ISD, Harlingen ISD, and La Joya ISD, from approximately 2003 to 2005. (*Id.* 18:3-23.) During this time, Hixson applied for permanent teaching positions but was not chosen for them. (*Id.* 38:11-12, 42:3-43:5.)

In January 2006, Hixson moved to Houston. (Hixson Dep. 48:11-13.) Prior to his move, Hixson submitted an application to join HISD's alternative certification program ("ACP"). (*Id.* 53:8-13.) Hixson was accepted to ACP on November 29, 2005. (*Id.* 59:5-8, Ex. 6.) ACP provides individuals (also known as "interns") with the opportunity to become certified teachers. (Warren-Ards Decl. ¶ 2.) ACP interns must complete a six-month training, pass the content portion of the Texas Examination of Education Standards ("State-required tests") and independently find employment within HISD. (*Id.*; Hixson Dep. 59:13-17, 60:8-16.) Once an ACP intern passes his or her first State-required test, the intern is eligible to apply for permanent teaching positions at various schools. (Hixson Dep. 61:6-8.) If chosen for a permanent teaching position, the ACP intern is given a one-year probationary teaching certificate. (*Id.* 59:18-23.) During this one-year probationary period, the ACP intern must complete all of the State-required testing. (*Id.* 68:24-69:4.) If the ACP intern does not pass the State-required testing by the end of their probationary term, their employment in the permanent teaching position will not be renewed. (*Id.* 69:5-11.) On the other hand, once the ACP intern meets all the ACP benchmarks and obtains recommendations from the school principal and the ACP director, the ACP intern is eligible to apply for their standard teaching certificate. (Warren-Ards Decl. ¶ 2; Hixson Dep. 69:13-19.)

Hixson began the HISD ACP program in February 2006 and completed his classes within the six month period. (Hixson Dep. 85:21-86:6.) Hixson had passed two State-required tests prior to moving to Houston. In December 2003, Hixson took the "special [education] content examination" from early childhood through 12th grade. (*Id.* 74:13-22.) In February 2004, he took

the special education "pedagogy and professional" text for early childhood through 12th grade. (*Id.* 72:18-73:8.) These tests allowed him to teach special education from early childhood through twelfth grade. (*Id.* 74:16-19.) He took his third State-required test, a generalist examination from early childhood to Grade 4, on February 18, 2006. (*Id.* 71:16-72:6.) This exam allowed him to teach early childhood to fourth grade students. (*Id.* 72:10-13.) Hixson's score on this exam placed him in the top eight percent of his "class."[1] (*Id.* 72:8-9.)

Because Hixson had already passed two State-required tests prior to his move to Houston, Hixson began applying in December 2005 for permanent teaching positions at HISD. (*Id.* 61:9-15; 71:2-5.) He continued to apply for permanent teaching positions at HISD schools throughout 2006, 2007, 2008, 2009, and until the present time. (*Id.* 86:7-8, 115:25-116:4, 128:22-129:6.) He has applied for approximately five thousand permanent teaching positions over the course of this time, and exactly three hundred thirty-eight (338) jobs in 2008.[2] (*Id.* 95:4; Warren-Ards Decl. ¶ 3.) In order to apply for permanent teaching positions at HISD, Hixson submitted an on-line employment application and attached his resume to the application. (Hixson Dep. 77:19-78:8, 101:14.) Over the years, Hixson updated his on-line employment application several times. (*Id.* 106:24-107:23.) More than one iteration of Hixson's employment application contained errors. In an application dated August 29, 2006, Hixson stated that he had a "professional certificate" for special education and a "probationary certificate" for EC-4 generalist, but should have indicated that he had probationary certificates for both positions. (*Id.* 79:4-22.) He also inaccurately described the special education certificate's length as "lifetime," when it should

---

[1] It is unclear whether Hixson refers to the "class" of fellow HISD ACP interns who might have taken this test or to the "class" of individuals at large who took this test, or to some other group altogether.

[2] In our Memorandum and Order dated May 2, 2011 (Doc. No. 46), we dismissed Hixson's claims of age discrimination that are based on HISD's discriminatory acts before May 26, 2008 or after December 22, 2008. We found that discriminatory acts that occurred outside of May 26, 2008 – December 22, 2008 were either time-barred or administratively unexhausted. Thus, we focus only on HISD's discriminatory acts between the dates of May 26, 2008 and December 22, 2008. Of the 338 positions Hixson applied to in 2008, it is unclear how many Hixson applied to between the dates of May 26, 2008 and December 22, 2008.

have stated "one year." (*Id.* 81:11-16.) Hixson characterized these as "clerical errors" and ascribes them to pressing the wrong button the computer. (*Id.* 79:23-24, 80:2, 81:14.) In another application, Hixson answered affirmatively to the question of whether he held a valid Texas certification even though he did not. (*Id.* 103:16-21.) He believed that holding a special education and elementary education certificate was the same as a valid Texas certification. (*Id.* 103:23-104:8.)

After failing to receive interest in his application, Hixson sought assistance from various HISD personnel. He spoke to Robin Williams ("Williams"), a recruiter for HISD's human resources department, who gave him advice regarding certain items on his on-line application that should be fixed. (*Id.* 101:13-25, 110:2-111:12.) Williams put Hixson in touch with Josephine Morgan ("Morgan"), an EEO officer at HISD. (*Id.* 120:20-121:6.) Hixson drafted a letter that outlined his qualifications, including his status as ACP intern and HISD Associate Teacher, his success on the State-required tests, and his two-years of experience as a substitute teacher. Hixson also included language stating that "[t]ypically, other ACP candidates have passed only one test and do not have the years of classroom teaching experience as substitute or associate teachers possessed by Hixson." (Doc. No. 64 Ex. 2.) Williams sent Morgan the letter drafted by Hixson and changed the sentence stating that Hixson was "head and shoulders" more qualified than other ACP candidates to instead state that Hixson was "highly recommended." (Hixson Dep. 121:6-9.) Morgan signed the letter in September 2006, though she had never met Hixson in person and only exchanged emails with him. (*Id.* 120:15-17, 145:22-24, 146:24-25.)

In 2008, HISD followed a selection process for its elementary education positions (kindergarten through fourth grade) and its special education positions. (Best Decl. ¶ 3.) School principals first reviewed an applicant's application, resume, cover letter, and reference letters.

(*Id.*) If the principal was impressed with the applicant's traits, the principal interviewed the applicant and sometimes asked the applicant to conduct a demonstrative teaching lesson. (*Id.*) At the end of this process, the principal made a job offer to the applicant chosen for the position. (*Id.*)

Since he began applying for permanent teaching positions at HISD, Hixson has been called for between five and ten in-person interviews with school principals or vice-principals. (Hixson Dep. 96:3-16.) At these interviews, Hixson spoke about his substitute teaching experience at HISD and in McAllen and about his test scores. (*Id.*132:20-22.) Hixson also conducted a computer demonstration of a pedagogical website to demonstrate the need for and utility of computers in the classroom. (*Id.* 132:22-134:16.) Hixson told the principals that he intended to purchase a computer for each student in his class and showed the principals $10,000 in cash to demonstrate his commitment. (*Id.* 134:17-135:21.)

Hixson heard numerous comments from other teachers and teacher aids at HISD schools that HISD did not hire older individuals for permanent teacher positions and looked for ways to get rid of older individuals. (*Id.* 91:13-93:21.) At a school board meeting in March 2009, Hixson heard school board member Harwin Moore congratulate Melissa Garrett, HISD's director of finance, for savings on healthcare costs for the school district. (*Id.* 87:16-89:3.) Based on comments of fellow teachers and Moore's remarks at the school board meeting, Hixson concluded that HISD's policy is to save on healthcare costs by hiring people under 40 years of age due to their lower healthcare costs as compared to people over 40 years old. (*Id.* 88:12-16; 99:5-6.) Hixson also concluded that the principals in charge of hiring decisions are given a bonus for keeping the school budget low, which fuels a financial incentive not to hire individuals with high healthcare costs, such as those over the age of 40. (*Id.* 140:22-142:18.) However, Hixson

5

never heard a principal comment that he or she would not hire someone over 40 years of age or that Hixson was not hired due to his age. (*Id.* 94:8-12; 96:22-25, 98:14-17.)

In September or October 2006, Hixson was hired by HISD as a substitute teacher. (*Id.* 49:18-21, 84:8-12.) Hixson remains a substitute teacher at HISD today. (*Id.* 84:13-15.) As a substitute teacher, Hixson is paid $10 per hour, receives no health insurance, and receives no benefits. (*Id.* 85:5-6, 143:25-144:4.)

Hixson filed a Charge of Discrimination with the EEOC on January 27, 2009, alleging age discrimination by HISD due to its failure to hire him for special education permanent teaching positions and EC-4 generalist permanent teaching positions. (*Id.* 112:7-15, 114:18-22.) In the Charge, Hixson stated that the earliest date of discrimination occurred on May 26, 2008 and that the latest date of discrimination was on December 22, 2008. (*Id.* 112:18-113:15.) Hixson claims that he was told by an EEOC representative that he could only put down charges for two years even though he had been discriminated against since "day 1." (*Id.* 112:22-113:9.) Hixson has not filed amended or new Charges of Discrimination against HISD. (*Id.* 113:16-114:10.)

Hixson subsequently filed suit against HISD and several individual defendants for age discrimination in violation of ADEA arising out HISD's refusals to hire him for permanent teaching positions. The individual defendants were subsequently dismissed. (Doc. No. 46.) Defendant HISD has now filed a motion for summary judgment and a motion to strike Hixson's statistical expert. The motions are briefed and ripe for disposition.

## II.    MOTION TO STRIKE PLAINTIFF'S STATISTICAL EXPERT

Hixson has proffered the expert report of Brian D. Marx ("Marx"), Ph.D., who is a professor in the Department of Experimental Statistics at Louisiana State University. Marx performed certain statistical analyses on a set of data supplied by Hixson. The results of Marx's

analyses have been submitted by Hixson as evidence that HISD discriminates on the basis of age in its hiring decisions.

HISD moves to strike Marx as an expert and to exclude his expert opinion on numerous grounds. Primarily, HISD argues that Marx's expert report does not meet the standards of Rule 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), because his opinions and methodologies are unreliable. In addition, HISD contends that Marx advances impermissible legal conclusions, his testimony will not assist the trier of fact, and that his testimony is unduly prejudicial.

### A.  Legal Standard

Federal Rule of Evidence 702 provides for the admission of expert testimony that assists the trier of fact to understand the evidence or to determine a fact in issue. A court is charged with a "gatekeeping function" to ensure expert testimony is both reliable and relevant. *Daubert*, 509 U.S. at 597. Reliability is analyzed under Rule 702, which requires that: (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case. Fed. R. Evid. 702. As to the second prong, the Supreme Court has provided five, non-exclusive factors to consider when assessing whether a methodology is scientifically reliable. These factors are (1) whether the expert's theory can be or has been tested, (2) whether the theory has been subject to peer review and publication, (3) the known or potential rate of error of a technique or theory when applied, (4) the existence and maintenance of standards and controls, and (5) the degree to which the technique or theory has been generally accepted in the scientific community. *Daubert*, 509 U.S. at 593-94. The test for determining reliability is flexible and can adapt to the particular circumstances underlying the testimony at issue. *Kumho Tire Co. v.*

*Carmichael*, 526 U.S. 137, 150-51 (1999). The party seeking to have the district court admit expert testimony must demonstrate that the expert's findings and conclusions are reliable, but need not show that the expert's findings and conclusions are correct. *Moore v. Ashland Chem, Inc.*, 151 F.3d 269, 276 (5th Cir. 1998).

Further, the expert witness must be qualified "by knowledge, skill, experience, training, or education . . . ." Fed. R. Evid. 702. A court must exclude an expert witness "if it finds that the witness is not qualified to testify in a particular field or on a given subject." *Wilson v. Woods*, 163 F.3d 935, 937 (5th Cir. 1999); However, "Rule 702 does not mandate that an expert be highly qualified in order to testify about a given issue. Differences in expertise bear chiefly on the weight to be assigned to the testimony by the trier of fact, not its admissibility." *Huss v. Gayden*, 571 F.3d 442, 452 (5th Cir. 2009) (citing *Daubert*, 509 U.S. at 596).

Under Rule 704(a), "testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." Fed. R. Evid. 704(a); *United States v. Izydore*, 167 F.3d 213, 218 (5th Cir. 1999). "Rule 704, however, does not open the door to all opinions." *Owen v. Kerr-McGee Corp.*, 698 F.2d 236, 240 (5th Cir. 1983). Expert witnesses may neither tell the jury what result to reach nor provide legal conclusions. *Id.*

The party seeking to rely on expert testimony bears the burden of establishing, by a preponderance of the evidence, that all requirements have been met. *Daubert*, 509 U.S. at 593, n.10; *Moore*, 151 F.3d at 276.

**B.  Marx's Professional Qualifications and Expert Opinions**

Marx has been a Full Professor of Statistics in the Department of Experimental Statistics at Louisiana State University since 1999. (Expert Report of Brian D. Marx ("Marx Report")

App. A at 2, Doc. No. 37.) He previously held academic positions at Leiden University in The Netherlands, at LMU University of Munich in Germany, and at Stanford University. (*Id.*) Marx received his Master's Degree in Statistics from Penn State University and his Ph.D. in Statistics from Virginia Tech (Virginia Polytechnic Institute and State University). (*Id.* at 1.) He has published a number of book chapters and articles regarding regression models in statistical modeling and has two books scheduled to be published in the forthcoming year. (*Id.* at 2-5.) He is editor of a journal, *Statistical Modelling: An International Journal*, and is the statistical editor of another journal, *Journal of Apicultural Research*. (*Id.* at 8.) Over the last seventeen years, he has provided professional statistical consulting services in a variety of cases and topics. (Marx Dep. 11:5-14:7.)

In one project from 1994 to 1996, Marx analyzed the possible employment discrimination in the mass firing of restaurant workers at a major hotel. (*Id.* 14:11-15:2.) Marx conducted several statistical analyses in order to determine whether there was a significant association between the race of an employee and the proportion in which a particular race was represented in a management level or level of employment. (*Id.* 15:11-18:2.) His analyses resulted in a determination that there was a disparity in the distribution across race at various levels of management and that these disparities were significant. (*Id.* 19:17-19.) Marx did not testify as an expert in that case, but did present several charts with statistical summaries to his client. (*Id.* 18:18-19:5.) Other than this case and Hixson's case, Marx has not performed any consulting work with respect to employment discrimination litigation. (*Id.* 20:16.) Marx does not have any specialized training with respect to statistical analyses in employment discrimination, has never taught courses on employment discrimination or employer hiring, and has never

conducted research or authored publications on the topic of employment discrimination or hiring practices, (*Id.* 21:6-21, 22:22-23:5, 28:15-23, 29:1-4, 30:2-23, 32:8-12, 32:25, 35:7-12, 43:2-17.)

Marx has prepared and submitted an expert report at the request of Hixson. (Marx Report App. B.) In his report, Marx conducted one statistical analysis. Marx was given by Hixson a chart containing data purportedly supplied by the Texas Education Agency (the "TEA Chart" or "PIR 9794"). (Marx Report App. D; Marx Dep. 69:22-70:3, 78:8-10.) In addition, Marx was supplied a statistical analysis containing programming, a summary of the data, charts, and tables prepared by an individual named Yanli Chen ("Chen"). (Marx Dep. 70:6-9.) Chen's programming synopsis and charts are attached to Marx's Report as Appendix C. (Marx. Report App. C; Marx Dep. 70:8-9.) Marx spoke to Chen about her statistical methodology and data structure and confirmed that Chen's statistical analysis was also based upon the data in the TEA Chart. (Marx Dep. 71:2-24.) Marx then performed his own statistical analysis using certain data in the TEA Chart. (*Id.* 72:2.)

The TEA Chart contains a list of HISD ACP candidates who applied for employment at HISD between 2006 and 2008. (Marx Dep. 83:9-12, 85:2-5.) The TEA Chart contained information regarding a number of characteristics about each individual (e.g., ethnic group, gender), only two of which are relevant here. First, each individual was assigned to an age or "birth" group. (*Id.* 72:16-19; Marx Report App. D.) Second, each individual was listed as "employed" or not employed (also referred to as "hired" or "not hired"). (Marx Report App. D; Marx Dep. 72:20-73:9.) Marx assumed that the list of HISD ACP candidates in the TEA Chart was representative of the entire applicant pool for teaching jobs at HISD because the TEA Chart was "an applicant pool provided by the Texas Education Agency." (Marx Dep. 77:13-21.)

Marx began with the null hypothesis that there was no association between age group and hiring rate. (Marx Dep. 74:15-17.) In other words, Marx began with the hypothesis that the hiring rate was constant across age group, i.e., that the proportion of individuals with each age group would remain constant across the "hired" group of individuals and the "not hired" group of individuals. (*Id.* 74:20-23.)

Marx then used the Chi-Square Test for Independence. (*Id.* 69:7-8.) The Chi-Square Test is a statistical method that tests for association across two variables that are categorical in nature.[3] (*Id.* 69:11-12.) He used "age group" as the first variable and "hired or not hired" as the second variable within the Chi-Square Test in order to determine whether there was a significant association or dependency contingency between these two variables. (*Id.* 69:17-20.) In essence, Marx used the test to arrive at percentages of individuals who were hired within a particular age group. (*Id.* 73:6-9.) The results of his analysis were that "the profiles of the distributions of age groups significantly varied across those people who were hired when compared to those people who were not hired." (*Id.* 73:12-14.) In other words, Marx found that older age groups are hired at a lesser rate than persons in the younger age group. (*Id.* 75:15-18.) Specifically, Marx found

---

[3] As succinctly described in *Local Union Nos. 605/985, IBEW v. Miss. Power & Light Co.*, Case No. 3:96-CV-572WS, 2004 U.S. Dist. LEXIS 31182 (S.D. Miss. Sept. 30, 2004), the Chi-Square test is a statistical method that may be used to determine whether differences in selection rates are associated with a particular variable, such as age:

> The chi-square procedure establishes an expected selection rate and then determines whether the difference between the expected selection rate and the actual selection rate is statistically significant. Small deviations are expected to occur as a result of chance, but at some point the deviation becomes so large that chance alone can be ruled out. For example, if thirty-three (33) persons passed an exam that made them eligible for promotion, and, of this thirty-three (33), the racial breakdown was twenty-four (24) whites, six (6) African Americans, and three (3) Hispanics, then the percentage of whites is 72%; the percentage of African Americans is 18%; and the percentage of Hispanics is 10%. If 22 of these persons are promoted, then one might expect that 72% of the 22 would be white (16); 18% would be African American (4); and 10% would be Hispanic (2) if the promotions were made at random. The chi-square test measures deviation from expected behavior. Any deviation from this expectation may indicate some influence other than random chance. Although some deviation may be expected to occur by chance, too much deviation must be accounted for by something other than chance. A significant chi-square value would indicate favoritism.

*Id.* at *30-*31 (omitting internal citations).

that the odds of one being hired under the age of 40 is 4.75 times greater than the odds of being

hired if one was over the age of 40. (*Id.*76:3-5.)

Marx believed that the rate of error of his findings was one in 1,000, but could be as low

as one in 12,000. (*Id.* 76:7-12, 121:11-18.) Marx found the statistical discrepancy to be

significant. (*Id.* 73:15-16.) Marx summarizes his statistical expert report as follows:

> I have been asked to review, summarize and verify the statistical methods
> performed on data related to the above case. I have read and reviewed a
> preliminary report based on 2008 data. The data are analyzed using a Chi-
> square test for association, which is an appropriate method for the tabulated
> data: Age group and Hiring count. The hypothesis that was tested is that no
> association exists between age group and hiring rate. The test statistic follows a
> chi-square distribution (with appropriate degrees of freedom) under this
> assumption of no association. The data finds extremely compelling evidence of
> a significant association (i.e. older age groups are hired less), and thus there is
> significant evidence to reject this hypothesis of no association. The data were
> explored more thoroughly through statistical regression techniques by breaking
> down the data by various job types, which also demonstrated significant
> relationships. In summary, I found the statistical analysis to be valid and highly
> significant in finding associations.

(Marx Report App. B.)

Outside of his expert report, Marx conducted two additional statistical analyses. The first

analysis involved data provided by HISD consisting of a list of the positions for which Hixson

applied and were filled by ACP interns during the period of 2008-09 (the "HISD Chart"). (Marx

Dep. 102:15-17, 124:12-22.) Not all the ACP interns on the HISD Chart were *HISD* ACP

interns; some were interns enrolled in ACP programs offered by other school districts or

organizations. (*Id.* 127:17-15.) The HISD Chart contained only information regarding ACP

interns who were hired, and did not contain information regarding ACP interns who were not

hired. (*Id.* 102:15-17, 124:25-125:1.) Similar to his analysis of the TEA Chart, Marx examined

whether the age distribution of individuals hired was similar to the age distribution of applicants

to the positions. (*Id.* 125:2-9.) Because the HISD Chart did not contain information about the

individuals who applied, but were not hired for the positions, Marx estimated the age distribution of the entire pool of applicants using the data contained in the TEA Chart. (*Id.* 125:6-9.) Marx's applied the Chi-Square Test to the data in the HISD Chart. (*Id.* 129:13-14.) The hypothesis Marx tested was whether the data in the HISD Chart fit well with or significantly departed from the age distribution of individuals in the TEA Chart. (*Id.* 130:1-4.) Marx could not conduct the same analysis as he had with the TEA Chart because he did not have data regarding the individuals who were "not hired" for the positions to which Hixson applied. (*Id.* 130:1-14.) His analysis of the HISD Chart showed that the hiring rate (or distribution of hired individuals over and under 40) was not representative of the applicant age pool, as supplied by the TEA Chart, and that there was a significant association between age and hiring rate. (*Id.* 125:9-19, 126:2-5.) Marx found that the odds of someone under 40 being hired was approximately 2.25 times greater than the odds of someone over 40 being hired. (*Id.* 125:9-19.) He believed that this finding was statistically significant, with the probability of making an error as one in 30.03. (*Id.* 125:16-19.)

The second analysis involved data provided by Hixson. (*Id.* 115:10-116:3.) Hixson told Marx that he had applied for approximately 2000 jobs and that there were approximately 300 applicants per job. (*Id.* 115:10-14.) Hixson also told Marx that he had zero offers. (*Id.* 115:14-15.) Based on this data, Marx calculated the probability of Hixson receiving zero offers as one out of 750. (*Id.* 115:14-19.) Marx's calculations showed that Hixson should have received approximately seven offers assuming that Hixson was average-qualified applicant. (*Id.* 115:19-116:3.)

As a result of his analyses, Marx concluded that HISD engaged in age discrimination in hiring decisions relating to teachers. (Marx Dep. 105:19-22, 106:3-8.)

**C. Analysis**

As many courts have recognized, statistics can play a significant role in discrimination cases. *See, e.g.*, *Wilkins v. Univ. of Houston*, 654 F.2d 388, 395 (5th Cir. 1981) (citing *Hazelwood Sch. Dist. v. United States*, 433 U.S. 299, 307-08 (1977)); *Carter v. Ball*, 33 F.3d 450, 456 (4th Cir. 1994) ("Statistics can provide important proof of employment discrimination."). Statistical evidence can be used either to establish an inference of discrimination as an element of plaintiff's *prima facie* case, or to rebut the employer's stated nondiscriminatory reason for its action as pretext. *See EEOC v. Texas Instruments Inc.*, 100 F.3d 1173, 1185 (5th Cir. 1996) ("statistical evidence may be probative of pre-text in limited circumstances"); *Anderson v. Douglas & Lomason Co.*, 26 F.3d 1277, 1285 (5th Cir. 1994) ("The plaintiffs may establish a prima facie case of disparate treatment by the use of statistics . . . .") (internal citations omitted). However, "the Supreme Court has cautioned 'that statistics are not irrefutable; they come in infinite variety and, like any other kind of evidence, they may be rebutted. In short, their usefulness depends on all the surrounding facts and circumstances.'" *Wilkins*, 654 F.2d at 395 (citing *Int'l Brotherhood of Teamsters v. United States*, 431 U.S. 324, 340 (1997)).

"Where plaintiffs use statistical evidence to challenge an employer's hiring practices, that evidence, to be probative of discriminatory intent, must compare the relevant portion of the employer's work force with the qualified population in the relevant labor market." *Anderson*, 26 F.3d at 1286 (quoting *EEOC v. Olson's Dairy Queens, Inc.*, 989 F.2d 165, 168 (5th Cir. 1993)); *Carter*, 33 F.3d at 456 (statistical analysis must compare presence or absence of minority employees to relevant labor pool). In determining the composition of the relevant labor market or labor pool, "[a]ctual applicant flow figures are the preferred method by which to measure an

employer's hiring practices and performance." *Anderson*, 26 F.3d at 1287; *see also Scott v. Univ. of Miss.*, 148 F.3d 493, 510 (5th Cir. 1998).

With these guidelines regarding the use of statistical evidence in employment discrimination cases in mind, we review the three statistical analyses conducted by Marx.[4]

### 1.  Analysis of TEA Chart

In his first analysis, Marx used data contained in the TEA Chart that provided the age groups and hiring rate of members of HISD's ACP program who applied to teaching positions. He compared the age distribution among all of the individuals listed in the TEA Chart to the age distribution among the individuals who were hired for teaching positions. He concluded that there was a statistically significant discrepancy in the hiring rate of applicants over 40 years of age as compared to the hiring rate of applicants under 40 years of age. Marx found that older applicants were hired at a lesser rate than persons in the younger age group. HISD has challenged this opinion on a number of grounds, including the unreliability of his methodology and the inaccuracy and incompleteness of the facts upon which his opinions are based. After a careful review of the data underlying Marx's analysis and the methodology he used, we must exclude Marx's opinion. We confine ourselves to the most serious deficiencies in Marx's analysis.[5]

---

[4] Although we have no doubt that Marx is an eminently qualified statistician, we view his almost-complete lack of academic and professional experience in the area of statistical analyses of employment discrimination and employer hiring practices as a serious challenge to his qualification to render an expert opinion in this case. *See* Fed. R. Evid. 702. Our findings regarding the deficiencies in Marx's data and analysis, including the failure to analyze the actual or potential applicant pool, suggest that familiarity with the use of statistics with the specialized area of employment discrimination law is essential. However, because we exclude Marx's expert opinion on other grounds, we need not resolve the issue of whether Marx is qualified to render an opinion in this case.

[5] There are many other deficiencies in Marx's analysis. For example, Marx's analysis did not limit itself to 2008, which is the relevant time period to this lawsuit. (Marx Dep. 97:9-11.) Neither Marx nor Hixson offer an explanation of why an analysis of the time period 2006 to 2008 should be appropriate when examining hiring decisions that occur within a much smaller segment of time within the larger time period. In addition, Marx's analysis appears to be based upon an analysis performed by an individual named Yanli Chen. Hixson has not identified who Chen is, what her role in this lawsuit has been, her statistical methods, why her charts and graphs should be included in Marx's report, or how her analysis meets the *Daubert* standard.

First, Marx's analysis is based upon data contained in a chart that was purportedly furnished by TEA to Hixson. However, the TEA Chart neither has been authenticated by an individual with personal knowledge that it contains accurate information and nor falls within a category of self-authenticating documents. *See* Fed. R. Evid. 901, 902. Other than Hixson's statement that the chart was provided by the TEA, we have no information about the chart's provenance. Without authentication of the TEA Chart, we cannot conclude that data underlying Marx's analysis is based upon sufficient facts or data, as required by Rule 702.

Second, the TEA Chart does not identify the positions for which the "hired" individuals were hired. (Marx Dep. 78:21-79:9, 98:23-25.) The TEA Chart does not even identify whether the "hired" individuals were hired as teachers. (Marx Dep. 133:14-19.) Hixson cannot use the TEA Chart to challenge discriminatory *teacher* hiring practices when he cannot even confirm that the data corresponds to individuals hired as teachers. Hixson is not bringing a challenge to discriminatory hiring practices by HISD in general (including, administrative, executive, or other positions), but rather is challenging HISD's hiring practices with respect to permanent *teaching* positions. Thus, data that does not confine itself to the hiring rate applicable to teaching positions is an insufficient bases upon which to test discriminatory hiring specific to this position.

Third, Marx does not know whether any of the individuals on the chart were actually hired by HISD. (Marx Dep. 83:17-23.) On the TEA Chart, each individual has a "yes" or "no" under the column entitled "Employed?". (Marx Report App. D.) However, there is also a column called "Organization Name" on the TEA Chart. (Marx Report App. D.) Each individual who is listed as employed has an "Organization Name" also listed. Each individual who is listed as not employed does not have an associated "Organization Name." (Marx Report App. D.) Four individuals who are listed as employed are associated with "Aldine ISD" as the "Organization

Name." (Marx Report App. D at 1.) Three individuals who are employed are associated with "Alief ISD." (Marx Report App. D at 1.) Two individuals who are employed are associated with "Pasadena ISD." (Marx Report App. D at 4.) One person who is employed is associated with "Northwest Preparatory" and one person is associated with "Yes College Preparatory School." (Marx Report App. D at 4.) This information suggests that the data, and the subsequent analysis, did not confine itself to the hiring rate of HISD and included the hiring rate of other schools. However, Hixson is challenging the discriminatory hiring practices of HISD, not the discriminatory hiring practices of HISD in conjunction with other schools. Neither is Hixson challenging the HISD ACP program's vulnerability to discriminatory hiring practices by employers in general. Rather, Hixson challenges HISD's discriminatory hiring practices with respect to permanent teaching positions. Thus, a data set that includes information about hiring by schools other than HISD is inappropriate to support an analysis of HISD's discriminatory hiring practices.

Fourth, and perhaps most importantly, the TEA Chart does not comprise the entire pool of candidates for teaching positions at HISD. (Marx Dep. 85:2-13.) The applicant pool Marx analyzed consisted only of HISD ACP candidates, but did not include ACP candidates from other ACP programs, or even more significantly, *certified teachers* who applied for teaching positions at HISD. (Marx Dep. 85:2-13.) Marx simply assumed that the TEA Chart represented the age distribution of the actual, entire pool of applicants for teaching positions at HISD. (Marx Dep. 126:10-17.) However, when determining the composition of the relevant labor pool, the actual applicant flow figures are the "preferred method" by which to measure HISD's hiring practices and should be used if available. *See McClain v. Lufkin Indus.*, 519 F.3d 264, 279 (5th Cir. 2008), *cert. denied*, 555 U.S. 881; *Anderson*, 26 F.3d at 1287; *Scott*, 148 F.3d at 510. Here,

Hixson has not demonstrated that actual applicant flow data is unavailable. What Marx analyzed and used as the "relevant labor pool" was not the entire actual pool (or even the entire potential pool) of applicants for HISD's permanent teaching positions, but only a subset of applicants (the subset being members of HISD's ACP program). In order for Marx's statistical analysis to meet the standards outlined by the Fifth Circuit, Marx should have analyzed data regarding the entire actual applicant pool, or if this was unavailable the entire potential applicant pool, for HISD's permanent teaching positions. Alternatively, Marx should have provided some basis for his assumption that the age distribution of individuals in the TEA Chart was representative of the age distribution of the actual applicant pool or the age distribution of the potential labor pool. We cannot credit Marx's assumption based only upon his *ipse dixit* statement. Indeed, we note that some of the applicants left out of the labor pool, i.e. certified teachers, are individuals whose age distribution might skew towards the older range of ages.

Fifth and finally, Marx's analysis did not take into account various factors that may have been used by principals in making hiring decisions, such as references for each candidate, substitute teaching experience, and other variables, because he did not believe that the distribution of these factors would vary across age groups in the TEA Chart. (Marx Dep. 107:12-20, 107:12-20.) In *Bazemore v. Friday*, 478 U.S. 385 (1986), the Supreme Court held that the plaintiffs' regression analysis of a wage disparity between black and white employees with the same job title, education and tenure was admissible even though there were other variables, such as county-by-county wage variations, that might have accounted for the salary disparity. The Supreme Court found that, though "the omission of variables from a regression analysis may render the analysis less probative than it otherwise might be," it does not make the analysis unacceptable as evidence. *Id.* at 400. However, a regression analysis that fails to take into

account *significant* non-discriminatory factors, such as education and prior work experience, may be rejected as flawed. *See Medley v. DOJ of La.*, No. 10-31107, 2011 U.S. App. LEXIS 9954, *8-*9 (5th Cir. May 16, 2011) (statistical analysis failed to account for several major variables, including education, past work experience, and length of job tenure); *Sheehan v. Purolator, Inc.*, 839 F.2d 99, 103 (2d Cir. 1988). Here, Marx failed to take into account two extremely important factors—education and prior work experience—that may account for the disparity he found between the hiring rate of individuals under 40 and the individuals over 40. As such, we find that this flaw is one that renders the statistical analysis inadmissible. *See Medley*, 2001 U.S. App. LEXIS 9954 at *8 (citing *Bazemore*, 478 U.S. at 400 n.10 (noting that there are "some regressions so incomplete as to be inadmissible as irrelevant")).

## 2. Analysis of HISD Chart

In his second analysis, Marx relied upon the data contained in the HISD Chart. The HISD Chart listed all of the positions for which Hixson applied and were filled by ACP interns during the period of 2008-09. Marx's analysis of the HISD Chart showed that the hiring rate of ACP interns was not representative of the applicant age pool. However, the labor pool used in this analysis was drawn from the TEA Chart, which, as discussed above, was not representative of either the actual applicant pool or the potential applicant pool for permanent teaching positions at HISD. As such, we must reject this analysis as unsound because it did not analyze the actual or potential applicant pool and did not provide a basis for assuming that the age distribution among the individuals in the TEA Chart is representative of the age distribution among the actual or potential applicant pool.

## 3. Analysis of Job Offers Hixson Should Have Received

In his third and final analysis, Marx took information provided by Hixson regarding the number of permanent teaching positions at HISD to which Hixson applied, the number of applicants for each position, and the number of job offers Hixson received. Marx analyzed this data and concluded that Hixson should have received a certain number of job offers based on the number of applications he submitted. In addition, Marx concluded that the probability that Hixson received zero offers considering the number of job applications he submitted to be one out of 750.

We find Marx's analysis here to be based upon insufficient data. Marx relied only on the figures provided by Hixson, which Hixson, in turn, heard at a court hearing. Marx testified that he did not know in what time period Hixson applied for the approximately 2000 jobs. (Marx Dep. 120:11-13.) He does not know how many jobs Hixson applied for in 2008. (Marx Dep. 120:8-10.) He does not possess the exact number of jobs that Hixson applied to. (Marx Dep. 120:6-7.) Hixson himself obtained these numbers during an "evidentiary" hearing where HISD's counsel stated that Hixson applied for 2000 jobs and that 300 applicants applied for each job. (Marx Dep. 144:16-20.) However, Hixson has not verified that these figures are exact or even close approximations to the actual number of Hixson's job applications and the number of applicants for each position. Without appropriate evidence supporting these figures as accurate and complete, we cannot conclude that they comprise sufficient data for Marx's analysis.

In sum, we exclude the entirety of Marx's expert opinion due to the insufficient facts and data upon which it is based and the failure of Marx's statistical method to take into account significant variables distinguishing the applicant pool, such as education and prior work history.

## III.    SUMMARY JUDGMENT LEGAL STANDARD

A motion for summary judgment requires the Court to determine whether the moving party is entitled to judgment as a matter of law based on the evidence thus far presented. FED. R. CIV. P. 56(c). Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Kee v. City of Rowlett*, 247 F.3d 206, 210 (5th Cir. 2001) (quotations omitted). A genuine issue of material fact exists if a reasonable jury could enter a verdict for the non-moving party. *Crawford v. Formosa Plastics Corp.*, 234 F.3d 899, 902 (5th Cir. 2000). The party moving for summary judgment must demonstrate the absence of a genuine issue of material fact but need not negate the elements of the nonmovant's case. *Exxon Corp. v. Oxxford Clothes, Inc.*, 109 F.3d 1070, 1074 (5th Cir. 1997). If the movant meets this burden, then the nonmovant is required to go beyond its pleadings and designate, by competent summary judgment evidence, the specific facts showing that there is a genuine issue for trial. *Id.* The Court views all evidence in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Id.* Hearsay, conclusory allegations, unsubstantiated assertions, and unsupported speculation are not competent summary judgment evidence. F.R.C.P. 56(e)(1); *See, e.g.*, *Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996), *McIntosh v. Partridge*, 540 F.3d 315, 322 (5th Cir. 2008); *see also Little v. Liquid Air Corp.*, 37 F.3d 1069, 1975 (5th Cir. 1994) (noting that a non-movant's burden is "not satisfied with 'some metaphysical doubt as to the material facts.'" (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

## III.   SUMMARY JUDGMENT ANALYSIS

HISD has moved for summary judgment on Hixson's claim of age discrimination under the ADEA. It contends that Hixson cannot establish a *prima facie* case of discrimination, that it

possesses legitimate, nondiscriminatory reasons for not hiring Hixson, and that Hixson cannot show that HISD's legitimate, nondiscriminatory reasons were pretextual. In Response, Hixson contends that he has established a *prima facie* case of discrimination, that HISD has failed to offer legitimate, nondiscriminatory reasons for its failure to hire him, and that HISD's reasons are mere pretext.

A plaintiff filing suit under the ADEA may allege age discrimination either under a theory of disparate treatment or disparate impact. *See Smith v. City of Jackson*, 544 U.S. 228, 240 (2005) (disparate impact theory of liability is available under ADEA); *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 141 (2000) (disparate treatment theory of liability available under ADEA). Only a disparate treatment claim is at issue here.[6] To prove disparate treatment under the ADEA, a plaintiff must prove, by a preponderance of the evidence, that age was the "but-for" cause of the challenged adverse employment action. *Gross v. FBL Fin. Servs.*, 557 U.S. __, 129 S. Ct. 2343, 2352 (2009). A plaintiff may prove intentional discrimination by presented either direct or indirect evidence. *Scott v. Univ. of Miss.*, 148 F.3d 493, 504 (5th Cir. 1998).

When a plaintiff does not possess direct evidence of discrimination, courts apply the burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). *See, e.g.*, *Reeves*, 530 U.S. at 142-43 (applying *McDonnell Douglas* to ADEA claim); *Scott*, 148 F.3d at 504 (same). Under this framework, a plaintiff must first establish a *prima facie* case of discrimination. *Reeves*, 530 U.S. at 142. If the plaintiff establishes a *prima facie* case, the burden shifts to the employer to "produce evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason." *Texas Dept. of Community*

---

[6] Although Hixson devotes a portion of his response brief to arguing a claim based on disparate impact, we will not consider this argument. In our Memorandum and Order dated June 13, 2011 (Doc. No. 58), we denied Hixson leave to amend his complaint and add a claim of age discrimination based on disparate impact. We found that granting leave was futile because Hixson had failed to exhaust his administrative remedies with respect to a disparate impact-based claim.

*Affairs v. Burdine*, 450 U.S. 248, 254 (1981). The burden imposed upon the employer at this stage is one of production, not persuasion; the evidence, if taken as true, would permit the conclusion that there was a nondiscriminatory reason for the adverse action. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993). If the employer proffers such a justification, the plaintiff must come forward with some evidence, direct or circumstantial, "to rebut each of the employer's proffered reasons and allow the jury to infer that the employer's explanation was a pretext for discrimination." *Scott*, 148 F.3d at 504. "[T]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Burdine*, 450 U.S. at 253.

It is undisputed that Hixson does not possess direct evidence of discrimination. (Hixson Dep. 94:8-12; 96:22-25, 98:14-17.) Therefore, we will analyze Hixon's claims of age discrimination under the *McDonnell Douglas* burden-shifting framework.

### A.  Hixson's *Prima Facie* Case of Discrimination

To establish a prima facie case for discriminatory failure to hire under the ADEA, the plaintiff must show that (1) he was over the age of forty at the time he was not selected; (2) he was qualified for the position he sought; (3) he was not selected; and (4) the job remained open or was filled by someone younger. *See Berquist v. Wash. Mut. Bank*, 500 F.3d 344, 349 (5th Cir. 2007) (citations omitted) (setting forth a prima facie case under the ADEA for discriminatory discharge); *Lindsey v. Prive Corp.*, 987 F.2d 324, 327 (5th Cir. 1993).

It is undisputed that the first and third elements of Hixson's *prima facie* case are met. Hixson was born on August 19, 1952 and over the age of 40 when he applied to all of the permanent teaching positions at HISD. (Hixson Dep. 16:10.) He was not selected for any of these

positions. Therefore, we will focus on the second and fourth elements of Hixson's *prima facie* case.

### 1.  Hixson Was Qualified for Positions Sought

HISD argues that Hixson was not qualified for the permanent teaching positions he sought because (1) his application and resume were poorly drafted and contained mistakes (or even misrepresentations), and (2) his resume was not tailored to the positions he sought because he failed to indicate that he wished to teach non-Special Education classes. HISD concedes that Hixson had completed and passed all State-required tests for the Special Education and Elementary Education (Kindergarten through Fourth Grade) teaching positions to which he applied in 2008. (Mot. Summ. J. at 4.) As a result of passing these tests, Hixson was eligible to teach Elementary Education up to the Fourth Grade or Special Education. (*Id.*)

The Fifth Circuit has recognized that this element of a *prima facie* case is met once a plaintiff demonstrates that he possesses the "objective" employment qualifications; whether the plaintiff possesses "subjective" qualifications are left to the pretext stage of the *McDonnell-Douglas* analysis. *See Lindsey v. Prive Corp.*, 987 F.2d 324, 326-27 (5th Cir. 1993) (holding *prima facie* case should not involve assessment of whether plaintiff met defendant's subjective qualification that dancers be "beautiful, gorgeous, and sophisticated"). Here, Hixson certainly possessed some of HISD's objective qualifications for permanent teaching positions because he had passed all of the State-required tests.[7] As for the "objective" requirement that Hixson specify the teaching position he sought on his resume, Hixson's failure to list his interest in Elementary Education positions potentially renders him unqualified only for the Elementary Education

---

[7] Hixson has also proffered evidence of his qualifications in the form of audio recordings and recommendation letters from HISD personnel. HISD has challenged the admissibility of audio recordings. We need not resolve this issue because we determine that Hixson was qualified for the positions he sought based on his undisputed deposition testimony that he passed the three State-required tests.

positions he sought. He remains qualified for the Special Education positions he sought because he clearly indicated in his resume that he desired to work in special education. Finally, with respect to HISD's "objective" criterion that applications and resumes be error-free and accurate, it is not clear that HISD actually used this as an objective qualification by which to reject applicants. Of the twenty-six declarations HISD submitted from the principals charged with hiring decisions, only four principals indicated that errors in Hixson's application materials were a reason they had chosen not to hire him. (Mot. Summ. J Ex. D-14, D-17, D-22, D-23.) Hixson's inclusion of errors in his application materials likely would have put him out of the running for teaching positions, but we believe there are fact issues as to whether principals actually used such errors as an "objective" criterion by which to disqualify applicants. Based on the undisputed fact that Hixson passed the State-required tests, we find that Hixson has proffered sufficient evidence to establish that he was qualified for the permanent teaching positions he sought.

### 2. Someone Outside Hixson's Protected Class Was Hired or the Position Remained Open

HISD argues that Hixson cannot establish this element of his *prima facie* case because, of the three hundred thirty-eight (338) positions to which he applied in 2008, thirty-two (32) individuals hired for those positions were over the age of 40. Twenty-seven (27) positions were either closed or not filled between May 26, 2008 and December 22, 2008.

Hixson has submitted a chart prepared by HISD listing the positions to which Hixson applied that were filled by ACP interns and containing birthdate information for the ACP interns. (Response to Mot. Summ. J. App. 6.) This chart demonstrates that many of the positions to which Hixson applied were filled by ACP interns younger than the age of 40.

Hixson has also submitted a chart prepared by HISD listing the positions to which Hixson applied that were filled by certified teachers, although this chart does not contain any birthdate

information for the certified teachers. (*Id.* App. 7.) The declaration of Sharron Warren-Ards, HISD Certification Officer, confirms the information contained in this chart—that, of the positions to which Hixson applied, two hundred twenty-three positions (223) were filled by certified teachers. (Warren-Ards Decl. ¶ 3.) Further, Warren-Ards states that thirty-two (32) individuals hired were over the age of 40. (Warren-Ards Decl. ¶ 4.) Assuming that these thirty-two individuals over 40 were all certified teachers, we are still left with the fact that HISD hired 191 certified teachers under the age of 40 for positions to which Hixson applied. As such, we find that Hixson has proffered sufficient evidence that the positions to which he applied were filled by individuals under the age of 40.

As for the 32 individuals hired who were over the age of 40, they may have been younger, the same age as, or older than Hixson. Hixson can meet his *prima facie* case by showing that someone younger was hired for the teaching positions. *See Berquist*, 500 F.3d at 349. To the extent that these 32 individuals were younger than Hixson, Hixson has demonstrated that someone younger was hired for the teaching positions.

With respect to HISD's contention that Hixson cannot meet this element of his *prima facie* case because 27 positions were either closed or not filled between May 26, 2008 and December 22, 2008, the positions that were not filled (remained open) can still serve as a basis for a *prima facie* case. *See Lindsey*, 987 F.2d at 327. As for the positions that were closed, these cannot serve as the basis for Hixson's *prima facie* case because these are not positions that were either filled by someone outside the protected class, someone younger than Hixson, or remained open.

Therefore, we find that Hixson has demonstrated that, with the exception of the positions that were closed between May 26, 2008 and December 22, 2008, the positions were filled by

individuals under 40, individuals younger than himself, or remained open. In sum, we find that Hixson has demonstrated the necessary elements of a *prima facie* case of age discrimination.

**B.  HISD's Proffered Legitimate, Nondiscriminatory Reasons**

HISD has proffered several legitimate, nondiscriminatory reasons for not hiring Hixson for the positions to which he applied. First, with respect to 223 positions, HISD hired certified teachers, who were more qualified than Hixson because they already possessed state certification. Second, with respect to 88 positions, HISD hired ACP interns instead of Hixson for several reasons: (a) Hixson's resume and application did not indicate the type of prior experience he had working with younger children; (b) Hixson's resume and application indicated that he was looking for a position other than the one posted at that particular school; (c) Hixson did not have prior experience teaching students with behavioral needs; (d) in his application materials, Hixson did not express a desire to be a part of a team; (e) Hixson did not possess a strong background in mathematics or some other particular field the principal was focused upon; (f) Hixson did not have as impressive of academic credentials as some other ACP interns; (g) Hixson's resume and application was poorly written and contained errors; (h) Hixson did not have prior experience working with the principal, unlike the person who was hired; (i) Hixson was not part of Teach for America, unlike other HISD ACP interns; (j) Hixson's act of offering $10,000 to principals at his interview left an unfavorable impression. (Mot. Summ J. at 12-15 & Ex. D; Best Decl. ¶¶ 4-8.)

All of the reasons proffered by HISD for not hiring Hixson are legitimate and nondiscriminatory. HISD's desire to hire individuals with greater experience or better qualifications, such as certified teachers, teachers with superior academic credentials or enrollment in Teach for America, or teachers with a particular type of work experience or subject

matter background, have been recognized as legitimate, nondiscriminatory reasons. *See Price v. Fed. Express Corp.*, 283 F.3d 715, 721 (5th Cir. 2002) (promoted candidate's management experience, military training and ties to local law enforcement served as legitimate, nondiscriminatory reasons for failure to promote plaintiff); *Scott*, 148 F.3d at 505-507 (plaintiff's lack of federal clerkship experience, inferior legal writing experience, and lack of classroom teaching experience as legitimate, nondiscriminatory reasons for failure to hire); *Bennett v. Total Minatome Corp.*, 138 F.3d 1053, 1061 & n.11 (5th Cir. 1998) (plaintiff's inability to speak French, insufficient offshore experience, and lack of drilling experience recognized as legitimate, nondiscriminatory reasons); *Pond v. Braniff Airways*, 500 F.2d 161, 165 (5th Cir. 1974) (no discrimination where employer weighed talents of respective applicants and chose one over other based on talent). As for Hixson's failure to profess a desire to work as part of a team, this too has been recognized as a legitimate, nondiscriminatory reason for an employer's adverse employment action. *See Bennett*, 138 F.3d at 1061 n.11 (legitimate, nondiscriminatory reason found in plaintiff's lack of team-building skills). With respect to the omissions and deficiencies in Hixson's application, these are very clear and specific reasons, unrelated to age, why Hixson would not have been selected for teaching positions. Finally, Hixson's offer of $10,000 in cash to purchase computers serves as a legitimate, nondiscriminatory reason for why he was not hired for the positions, even though the principals' negative reaction to this gesture was subjective. *See Alvarado v. Texas Rangers*, 492 F.3d 605, 616 (5th Cir. 2007) (subjective assessment of candidate's performance in interview may serve as legitimate, nondiscriminatory reason for candidate's non-selection); *Richter v. Hook-SupeRx*, 142 F.3d 1024, 1029 (7th Cir. 1998) (accepting employee's weak performance and lack of involvement in important job functions as legitimate, nondiscriminatory reasons).

Hixson challenges HISD's proffered legitimate, nondiscriminatory reasons on various grounds, none of which are meritorious. First, Hixson claims that HISD's preference for "prestigious schools, "highly regarded" programs, and applicants known to principals are not legitimate, nondiscriminatory reasons for hiring one candidate in favor of another because they have the tendency to result in discriminatory hiring practices. However, the case cited by Hixson, *Thomas v. Washington Cnty. Sch. Bd.*, 915 F.2d 922, 924-26 (4th Cir. 1990), dealt with hiring practices based on nepotism and "word-of-mouth." Here, the desire of HISD to hire graduates from prestigious schools or Teach for America and individuals with experience with a particular principal are perfectly legitimate, merit-based factors through which HISD attempts to hire the best qualified candidates. Second, Hixson contends that several of the proffered reasons are not credible[8] and that the declarations from principals are all self-interested. At this stage, however, HISD's burden is one of production, not persuasion. *See Bodenheimer v. PPG Indus.*, 5 F.3d 955, 958 (5th Cir. 1993) (court should avoid making credibility determinations because "the burden-of-production determination necessarily precedes the credibility-assessment stage. The employer need only articulate a lawful reason, regardless of what its persuasiveness may or may not be." (omitting internal quotation)).

We find that HISD has come forward with legitimate, nondiscriminatory reasons for its failure to hire Hixson sufficient to meet its burden under the *McDonnell Douglas* framework.

## C.  Hixson's Demonstration of Pretext

To establish pretext in a failure to hire claim, a plaintiff must demonstrate that the employer's nondiscriminatory reason was false or that the plaintiff was "clearly better qualified"

---

[8] For example, Hixson challenges the inference that his presentation of $10,000 at interviews was a bribe. Hixson claims that a close reading of the email he sent to a principal, and his continued work at the school after his interview without incident, shows that he did not offer a bribe and the principal did not take offense to offer.

than the others chosen for the position. *See Price v. Fed. Express Corp.*, 283 F.3d 715, 721-23 (5th Cir. 2002).

### 1.  Clearly Better Qualified

As an initial matter, Hixson cannot establish that he was "clearly better qualified" than the 223 individuals who were already certified teachers when HISD hired them for the teaching positions. Although Hixson is correct in stating that he was equally *eligible* to be hired for teaching positions as a certified teacher, he was not better *qualified* than the certified teachers because he was not yet certified. And, although Hixson may have had more years of substitute teaching experience than some of the certified teachers, this characteristic does not demonstrate that Hixson was *clearly* better qualified than certified teachers.

With respect to the 88 ACP interns hired by HISD for teaching positions sought by Hixson, Hixson has not demonstrated that he was clearly better qualified than these individuals either. Hixson claims that he had passed all three State-required tests at the time he applied to teaching positions, while some ACP interns had not passed any tests and some actually had failed tests. Hixson points to the TEA Chart as evidence for this assertion, but this evidence does not serve the purpose for which it is marshalled because we have no idea whether any of the individuals on this chart were hired for the positions sought by Hixson. Hixson also points to a chart entitled "Chart 1: Positions Hixson Applied For That Were Filled by ACP Interns." (Doc. No. 64 App. 6.) In reviewing this chart, we can only see four positions that were filled by ACP interns that had not passed a State-required test prior to their date of hire: Position Nos. 48232-2, 20169-3, 7141-1, and 62577-2. However, two of these positions (48232-2, 7141-1) were for Special Education teachers and the individuals who were hired for them had passed their Special Education test prior to their date of hire, even though they passed their Content test after the date

of hire. Hixson cannot demonstrate that he was clearly better qualified than these individuals, because they had passed the test necessary for a Special Education teaching position. The other two positions (20169-3, 62577-2) were also for Special Education teachers and the individuals hired for those positions had passed only the Content test prior to the date of hire, but not the Special Education exam. Arguably, Hixson could have been more qualified than these individuals, but without evidence about who these individuals were and their qualifications relative to those of Hixson, we cannot conclude that Hixson was *clearly* better qualified than them for the positions.

### 2.   Legitimate, Nondiscriminatory Reasons Were False

Hixson offers several arguments to rebut HISD's proffered legitimate, nondiscriminatory reasons as false. None of these succeeds in demonstrating that there is a genuine issue of material fact regarding the falsity of HISD's legitimate, nondiscriminatory reasons.

First, Hixson has argued that HISD had a policy to control healthcare costs by not hiring older applicants for teaching positions. However, Hixson has submitted no summary judgment evidence supporting the existence of such a policy. Hixson's references in his deposition to statements made by an HISD school board member at a school board meeting are insufficient to support a reasonable inference of age discrimination. These statements about the successful reduction of HISD's health care costs cannot serve as evidence of age discrimination because they do not refer in any way to Hixson's age, let alone the age of any applicant or employee, or the employment decisions of which he complains. *See Bennett v. Total Minatome Corp.*, 138 F.3d 1053, 1061 (5th Cir. 1998) (employer's statement that it intended to focus recruitment efforts on young people did not support inference of age discrimination because it did not refer to plaintiff's age or demotion); *Turner v. North American Rubber, Inc.*, 979 F.2d 55, 59 (5th Cir.

1992) (comment by plaintiff's supervisor that he was sending him "three young tigers" to assist with operations not sufficient evidence of age discrimination because it did not refer in any way to plaintiff's age and was not in any way related to plaintiff's discharge). The other comments Hixson heard about HISD's hostility towards older employees and desire to get rid of them have not been attributed to any HISD decisionmaker. *See Manning v. Chevron Chem. Co. LLC*, 332 F.3d 874, 882 (5th Cir. 2003) (in order for workplace comments to serve as evidence of discrimination, they must be made by individual with authority over the employment decision at issue). Therefore, Hixson has not shown that HISD's legitimate, nondiscriminatory reasons are pretext because HISD was, in fact, motivated by a desire to lower healthcare costs through the lack of hiring of older applicants.

Next, Hixson contends that HISD's reliance on errors in his resume and application as a legitimate, nondiscriminatory reason is pretext because he had his resume reviewed by various people in HISD's personnel department. These HISD employees, specifically Josephine Morgan and Robin Williams, either did not catch the errors on Hixson's application or endorsed Hixson as a highly recommended applicant despite the errors. Unfortunately, neither of these individuals' actions can demonstrate that HISD's failure to hire Hixson was pretext. It is undisputed that neither individual was involved in hiring decisions with respect to the positions that Hixson applied. Therefore, Williams' and Morgans' review and endorsement of Hixson's materials says nothing about whether the principals' who reviewed Hixson's materials found the errors contained in them to be a reason to exclude Hixson. Hixson cannot use the endorsement by Williams and Morgan as evidence that the principals who made the hiring decisions were actually motivated by Hixson's age rather than by the errors. We also note that Morgan signed a recommendation letter drafted by Hixson and sent to Williams. There are no facts in the record

to indicate whether Morgan actually reviewed Hixson's application materials. Therefore, Hixson's claim that Morgan reversed her endorsement of Hixson's application materials post-lawsuit is undermined by ambiguous nature of Morgan's initial review of Hixson's materials.

Next, Hixson argues that HISD's reliance on the Teach for America ("TFA") program as a source of highly qualified candidates is pretext. Hixson's argument is not very clear, but it appears that he believes that the real reason why HISD prefers TFA participants is because they are young and they have lower health care costs. In addition, Hixson believes that nepotism is at work in the hiring of TFA candidates because Ann Best, HISD's Chief Human Resources Officer, is an alumna of the TFA program. As the Fifth Circuit has stated, "we should not substitute our judgment of an employee's qualifications for the employer's in the absence of proof that the employer's nondiscriminatory reasons are not genuine." *EEOC v. Louisiana Office of Community Servs.*, 47 F.3d 1438, 1448 (5th Cir. 1995). Here, Hixson's arguments do not attack HISD's reliance on TFA as false in the sense that HISD did not hire TFA candidates or was not motivated by a preference for TFA candidates. Rather, Hixson is really arguing that HISD is unjustified in using TFA candidates because of the propensity for nepotism and doubts about the program's cost-effectiveness.[9] These types of arguments do nothing to meet Hixson's burden that age discrimination is actually what lay behind HISD's preference for TFA candidates over him. Finally, with respect to the purported lower health care costs of TFA candidates, we simply do not possess competent summary judgment evidence to consider this proposition.[10]

---

[9] Hixson also contends that HISD's reliance on TFA candidates leads to a disparate impact upon individuals over 40 who apply for teaching positions because TFA has only been in place for 12 years and, consequently, TFA candidates are unlikely to be over the age of 40. Again, we have dismissed Hixson's claims based upon a disparate impact theory of discrimination.

[10] Hixson attempts to rely upon newspaper articles and academic studies of the TFA program as evidence that TFA candidates are younger and have lower health care costs than individuals over 40. (Doc. No. 64 App. 8, 9.) HISD has challenged this evidence as hearsay. We agree with HISD that these documents are not competent summary judgment evidence.

Similarly, Hixson challenges as pretext HISD's reliance on "prestigious schools," the fact that individuals hired were previously known to the hiring principals, and the hired candidates' prior successful experience working at the schools where they were hired. However, Hixson has not submitted any summary judgment evidence that HISD did not, in fact, rely upon these reasons when making hiring decisions. *See Scott*, 148 F.3d at 504 (jury issue presented where there is fact issue as to whether each of employer's stated reasons was what actually motivated employer). Hixson relies heavily on the case of *Lindsey v. Prive Corp.*, 987 F.3d 324, 328 (5th Cir. 1983), for the proposition that "an employer may not utilize wholly subjective standards by which to judge its employees' qualifications and then plead lack of qualification when its promotion process, for example, is challenged as discriminatory." This case is inapposite to the situation presented here. The reliance upon "prestigious" schools is not wholly subjective, as there are rankings and other metrics by which to decide which schools provide better academic training than others. Similarly, the reliance upon prior teaching experience at a school and the principal's familiarity with a candidate is not a subjective assessment, but an objective characteristic about an application. Even assuming that these characteristics were subjective, Hixson has not supplied any evidence to indicate that HISD was less than truthful when relying upon these characteristics. In *Lindsey*, in contrast, the plaintiff provided some evidence that a gentleman's club was not truthful when it claimed she was not "beautiful, gorgeous, and sophisticated." *Id.* at 328.

Rather, Hixson contends that HISD *should not have* relied upon these characteristics when hiring teachers. However, none of the reasons why Hixson contends that reliance upon these characteristics is unadvisable is linked to age discrimination. Hixson believes that taking into consideration academic prestige, connections to hiring principals, and prior experience at a

school results in the exclusion of qualified candidates. While this may be true, there is no indication that any exclusion is motivated by a desire to discrimination against applicants based on age.

Finally, Hixson believes that HISD's reliance upon the purported "bribe" Hixson made to principals is pretext. Hixson contends that he did not attempt to bribe the principals, but merely intended to demonstrate his financial ability to purchase computers for students. He attacks the credibility of the declaration of Clifford W. Buck ("Buck"), principal of Shearn Elementary who hired a Special Education Support Class Teacher (Position No. 26368-4). (Mot. Summ. J Ex. D-2.) In his declaration, Buck states that the individual hired was selected because she had prior experience working with children who had behavioral problems. (*Id.* ¶ 2.) Buck states that he did not hire Hixson due to Hixson's problems with classroom management while a substitute teacher at the school and Hixson's derogatory statements about students. (*Id.* ¶ 3.) Buck also states that Hixson emailed him with an offer of $10,000 dollars to buy computers for students, which Buck interpreted as inappropriate bribery to solicit a job. (*Id.*) Hixson contends that Buck's proffered reasons are not credible because Buck never brought the derogatory comments or his concerns about the "bribe" to Hixson's attention at any point during the last three years that Hixson has worked at Buck's school as a substitute teacher. (Doc. No. 64 at 16.) We believe that Hixson's assertions do raise a genuine issue of material fact with respect to pretext over HISD's failure to hire him for Position No. 26368-4. Hixson has shown that there are reasons to doubt the credibility of Buck's reasons for not hiring Hixson. However, Hixson's assertions are merely arguments contained in a motion and are not competent summary judgment evidence. Hixson cannot use these unsupported assertions as a basis to defeat summary judgment.

We conclude that Hixson's evidence fails to raise a genuine issue of material fact as to pretext or falsity. Hixson has failed to meet his burden in order to defeat summary judgment. Therefore, we grant summary judgment to HISD on all of Hixson's claims.

## IV.    CONCLUSION

Defendant's Motion to Strike Plaintiff's Statistical Expert (Doc. No. 59) is **GRANTED**. Defendant's Motion for Complete Summary Judgment (Doc. No. 61) is **GRANTED**. Plaintiff's claims against Defendant HISD are **DISMISSED**.

**IT IS SO ORDERED**.

**SIGNED** this the 17 day of August, 2011.

_____
KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE